IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NANO-PROPRIETARY, INC. )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TILL KEESMANN, )<br>)<br>Defendant. ) | No. 06 C 2689<br>Judge Wayne R. Andersen |

## MEMORANDUM OPINION AND ORDER

Plaintiff Nano-Proprietary, Inc. ("NPI") brought this action against Defendant Till Keesmann ("Keesmann"), alleging that Keesmann's purported termination of the May 26, 2000 Patent License Agreement (the "License Agreement") between NPI and Keesmann was invalid. On May 19, 2006, this court approved the parties' agreed stipulation to Plaintiff's motion for a temporary restraining order. NPI now asks this court to enjoin Keesmann from terminating the License Agreement to prevent permanent and irreparable damage to NPI's business and intellectual property. For the foregoing reasons, Plaintiff's motion for a preliminary injunction will be granted when the Court sets the appropriate bond.

## BACKGROUND

NPI is a technology company specializing in intellectual property. On May 26, 2000, NPI, then operating as SI Diamond Technology, Inc., entered into a Patent License Agreement with Till Keesmann, a German citizen. The agreement gave NPI the exclusive, worldwide right

1

and license to sublicense Keesmann's patents pertaining to carbon nanotubes as cathodes for field emission displays. The License Agreement was entered into by the parties for the primary purpose of selling sublicenses for the patents to third parties. NPI covenanted that it would support Keesmann in maintaining and strengthening the patents, actively market the patents to third parties, identify infringers of the patents, and use commercially reasonable efforts to seek remedies for infringements. In turn, Keesmann agreed not to license or sublicense his patents to anyone other than NPI during the term of the License Agreement, and not to unreasonably withhold approval of proposed sublicenses. NPI promised to pay Keesmann quarterly royalties, and agreed to pay Keesmann an aggregate sum of $1,000,000 within four years of the beginning of the License Agreement.

Termination of the License Agreement is triggered in the event of default of any obligation under the License Agreement. If either party were to terminate the License Agreement, that party must give sixty days' notice by registered mail, specifying the basis for termination. The party receiving the termination notice has sixty days to cure the default. Specifically, the default provision of the License Agreement reads:

> If either party shall be in default of any obligation hereunder, or shall be adjudged bankrupt, or become insolvent, or make an assignment for the benefit of creditors, or be placed in the hands of a receiver or a trustee in bankruptcy, the other Party may terminate this Agreement by giving sixty (60) days' notice by registered mail to the other Party, specifying the basis for termination. If within sixty (60) days after the receipt of such notice, the Party receiving notice shall remedy the condition forming the basis for termination, such notice shall cease to be operative, and this Agreement shall continue in full force.

Keesmann's belief that NPI was in default under this provision led to Keesmann's early declaration of termination of the License Agreement and forms the basis of NPI's claim for a

preliminary injunction.

When the License Agreement was formed, the market for carbon nanotubes was undeveloped, but both NPI and Keesmann believed there was tremendous potential for its commercial success, especially in the flat panel displays market. The parties agree that several multinational corporations are close to developing, or have developed, products using carbon nanotube cathodes. The patents under the umbrella of the License Agreement have the potential to make flat panel displays more energy efficient, last longer than plasma displays, and have a brighter and wider viewing area than liquid crystal displays. NPI and Keesmann believe carbon nanotube displays can displace plasma and liquid crystal displays in the flat panel display market and stand to generate potentially tens of billions of dollars a year.

Since the execution of the License Agreement, NPI helped to complete the United States reissue process for one of Keesman's patents covered by the License Agreement, and, with the assistance of NPI, Keesmann was reissued two additional patents covered by the License Agreement by the United States Patent and Trademark Office. The parties agree that these reissuances significantly enhanced the value and marketability of the License Agreement.

After the patents were reissued, NPI solicited nineteen different large electronics corporations to sublicense the patents pursuant to the License Agreement. NPI made developmental sales of carbon nanotube cathodes to eighteen different research corporations, government agencies and universities in order to spur development of a market for the new technology. NPI also participated in worldwide trade shows and technical exhibitions to publicize, commercialize, and encourage licensing of the patents under the License Agreement and manufactured 14 inch and 25 inch flat displays using the carbon nanotube technology for

3

"proof of concept" demonstrations at the shows.

By May, 2004, NPI had paid Keesmann all the required royalty payments under the License Agreement, totaling approximately $1,250,000. On June 7, 2005, Keesmann notified NPI of his contact with a German capital market fund consisting of private investors closely connected with IBP AG ("IBP"), a German company specializing in valuing patents. Keesmann indicated that IBP evaluated the patents under the License Agreement and concluded they had significant potential and value. Keesmann also informed NPI that he had assigned 16% of his royalty rights under the License Agreement to the investors.

On September 28, 2005, Keesmann notified NPI of an additional assignation of his royalty rights to another German company, and a client of IBP, which specialized in finding transaction partners for licenses. The new assignee, NPV Nano Patent Gmbh & Co, received 10% of Keesmann's royalty rights under the License Agreement.

Keesmann arranged a meeting so that NPI and IBP executives could meet. On November 30, 2005, NPI's President, Dr. Zvi Yaniv, attended a meeting in Dresden, Germany. Keesmann's German representatives indicated that Keesmann intended to sell the patents under the License Agreement. On December 12, 2005, Keesmann asked NPI to grant him the right to auction off NPI's interest in the License Agreement. NPI rejected Keesman's request, stating it would not release the patents for less than a minimum bid of $200,000,000. Keesmann did not accept the offer.

Between December 21, 2005, when Keesmann confirmed, by letter, his intention to find a buyer for the patents, and March 22, 2006, when Keesmann provided his notice of termination under the License Agreement, the parties entered into prolonged discussion about Keesmann's

4

right to sell the patents and NPI's responsibility to allow an audit under the License Agreement. On December 30, 2005 Keesmann requested a full audit under the License Agreement. On January 3, 2006, NPI consented to the audit, but noted that "there have been no sublicenses signed related to this patent and therefore the only payments made have been the minimum royalty payments specified under the agreement. As a result, there will not be many records for you to look at." Over the next two and a half months, the parties fought over the scope of the audit as well as NPI's insistence on a confidentiality agreement.

> The License Agreement provides, in relevant part:
>
> Licensee shall keep accurate records of all operations affecting payments hereunder, and shall permit Licensor or its duly authorized agent to inspect all such records and to make copies of or extracts from such records .... Licensee shall report to Licensor information about all important incidents concerning the Patents. Also, any agreements with sub-licensees and the related correspondence is to be made available to the Licensor. . . .

Keesmann's audit request sought production of documents including all agreements with Canon, Inc., documents relating to operations affecting payments under the License Agreement, and all documents relating to (1) NPI's efforts to maintain and strengthen Keesmann's patents, (2) NPI's efforts to actively market Keesmann's patents, (3) NPI's efforts to identify infringers, and (4) NPI's manufacture, use, sale, or offer for sale of products using an emission of electrons from a carbon nanotube. NPI sought to restrict the scope of the audit to conform with its interpretation of the License Agreement, and asked Keesmann to sign a confidentiality agreement, the propriety and extent about which the parties disagreed.

On March 22, 2006, Keesmann provided notice of termination under the License Agreement, citing as bases:

> (1) NPI's failure to actively market the Keesmann patents, (2) NPI's failure to
> identify those infringing on the Keesmann patents and to use commercially
> reasonable remedies to seek remedies for the infringement, and (3) NPI's failure
> to comply with Keesmann's audit requests.

NPI responded on March 30, 2006, arguing that NPI was not in default of the License Agreement, and that Keesmann's termination notice was ineffective. NPI further accused Keesmann of demanding an audit solely as pretext for termination of the License Agreement.

NPI filed its federal lawsuit on May 15, 2006. This court approved Plaintiff's motion for a temporary restraining order, and on June 12, 2006, the motion for a TRO was converted into a motion for a preliminary injunction.

## DISCUSSION

NPI seeks preliminary injunctive relief to prevent substantial injury and irreparable harm to its business and intellectual property. Specifically, NPI seeks to enjoin Keesmann, his agents, employees, and all those acting in concert with him regarding his patents from terminating the License Agreement or otherwise acting in violation of the License Agreement.

In order to prevail on a motion for preliminary injunction, a party must show that (1) it is reasonably likely to succeed on the merits, (2) it is suffering an irreparable harm that outweighs the nonmovant's harm if the injunction were granted, (3) there is no adequate remedy at law, and (4) an injunction would not harm the public interest. *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 619 (7th Cir. 2004). Plaintiff has the burden of proving each of these factors. *Roland v. Air Line Employees Ass'n, Int'l*, 753 F.2d 1385, 1392 (7th Cir.1985). In this case, the court is satisfied that Plaintiff has met each of the four requirements.

*A. Likelihood of Success*

The first threshold Plaintiff must prove to support the issuance of a preliminary injunction is a reasonable likelihood of success on the merits. *Medco Research v. Fujisawa USA*, 1994 U.S. Dist. Lexis 18323 at *10 (D. Ill. 1994), citing *Retired Chicago Police Assoc. v. City of Chicago*, 7 F.3d 584, 608 (7th Cir. 1993). To demonstrate a reasonable likelihood of success on the merits, Plaintiff must show that its chance of prevailing is "better than negligible." *Kinney v. Int'l Union of Operating Engineers*, 994 F.2d 1271, 1275 (7th Cir. 1993).

NPI claims it has a strong likelihood of success on the merits because it will establish that (1) Keesmann had no right to terminate under the License Agreement, (2) Keesmann's method of termination was invalid, and (3) Keesmann failed to allow NPI sixty days to cure, as provided under the License Agreement. Keesmann argues that NPI defaulted, that he complied with the terms of the License Agreement, and that he properly terminated the contract.

1. Termination under the License Agreement

As noted above, in Keesmann's March 22, 2006 letter terminating the License Agreement, he claims NPI is in default of the License Agreement for three reasons: (1) NPI's failure to actively market the Keesmann patents, (2) NPI's failure to identify infringers and use commercially reasonable efforts to seek remedies for infringement, and (3) NPI's failure to comply with Keesmann's audit requests.

7

a. Failure to Actively Market

NPI is required to "actively market" the patents under the License Agreement. However, in the discovery documents, depositions and oral arguments, Keesmann fails to identify deficiencies, nor does he highlight in what ways NPI could have more actively marketed the patents over the past five years. Notwithstanding the parties' agreement that there is no current developed market for Keesmann's patents, NPI presented evidence that it solicited nineteen different large electronics corporations to sublicense the patents, it made developmental sales of carbon nanotube cathodes to eighteen different research corporations, government agencies and universities in order to spur development of a market for the new technology, and it manufactured 14 inch and 25 inch flat "proof of concept" prototype displays using the carbon nanotube technology. In addition, NPI also participated in worldwide trade shows and technical exhibitions to publicize, commercialize, and encourage licensing of the patents under the License Agreement.

The parties agree that Keesmann's patents are potentially worth hundreds of millions, if not billions, of dollars, but that no commercial application for the patents yet exists. The geographic sector of the electronics industry most receptive to the use of Keesmann's patents is Asia, a place in which Keesmann does not own patents. Until the market has identified both a commercial application for the patents, as well as a viable method of manufacturing those applications on a commercial scale, the sublicensing will be difficult. The absence of sublicensees, however, does not in itself, lead us to conclude that there has been a failure to actively market. We believe that NPI has adequately established that it actively marketed the sublicense agreements as contemplated under the License Agreement.

### b. Failure to identify infringers

Keesmann's second basis for claiming default is that NPI failed to identify infringers of the patents and use commercially available reasonable efforts to seek remedies for the infringement. In the preliminary injunction hearing, however, NPI established that on several occasions from 2002 through 2005, Keesmann and NPI discussed other companies using similar carbon nanotube technology and whether any of Keesmann's patents were being illicitly used in their development. Email conversations between Keesmann, his agent, Keith Williams, his former business partner, Hubert Grosse-Wilde, and NPI's president, Zvi Yaniv, establish that the lines of communication were open regarding infringers. From this dialogue, it appears that Keesmann was aware of other companies attempting to develop carbon nanotube technology. Further, the emails also show Keesmann was presented with multiple opportunities to discuss with NPI whether any infringement was occurring. However, Keesmann first introduced infringement as an adverse issue in his March 22, 2006 termination letter, offering no opportunity for cure. Moreover, Keesmann has not disputed NPI's assertions that the parties have discussed infringers, nor has Keesmann offered any support to establish that there were actual infringers against whom NPI failed to seek remedies. NPI has satisfactorily shown that it was not negligent in identifying infringers.

### c. Failure to comply with audit requests

The License Agreement provides that NPI shall keep accurate records of "all operations affecting payments" under the License Agreement and permit Keesmann to inspect and make copies of such records during the term of the License Agreement. Keesmann claims that NPI's

failure to comply with this audit provision is another reason to justify termination.

Keesmann requested an audit in late December, 2005, and, in early January, 2006, NPI agreed to comply. An audit request for specific documents was presented to NPI on January 17, 2006 and letters authorizing Keesmann's counsel to conduct the audit were finalized in mid-February, 2006. Between that time and March 22, 2006, when Keesmann terminated the License Agreement, NPI disagreed with Keesmann about the scope of the audit, and requested that Keesmann sign a confidentiality agreement prior to conducting the audit. Despite these stumbling blocks, we believe that, in light of the unique property that NPI was trying to protect, NPI's request for a confidentiality agreement and attempt to contain the extent of the audit is not necessarily unreasonable. However, we find that NPI's seeming attempts to change Keesmann's rights to records, as well as the controlling venue and substantive law provided in the License Agreement, is somewhat troubling. Nevertheless, whether Keesmann was seeking to jettison his patents and use the audit as a bargaining tool to insure NPI's compliance, or whether NPI was unreasonably restricting scope or requesting confidentiality in the audit, we conclude that NPI has sufficiently established that its response to Keesmann's audit requests under the License Agreement was reasonable.

2. Method of termination

The License Agreement provides that the method of termination is for the terminating party to provide sixty days' notice by registered mail, and that, within those sixty days, the party receiving the termination notice may "remedy the condition forming the basis for termination." Keesmann provided his notice of termination to NPI on March 22, 2006. He stated, in the last

paragraph of a three page letter via facsimile to NPI's counsel that:

> In light of NPI's many defaults in its obligations under the Patent License Agreement, Keesmann hereby provides notice of termination. There are several, independent bases for termination, including (1) [NPI]'s failure to actively market the Keesmann patents, (2) [NPI]'s failure to identify those infringing on the Keesmann patents and to use commercially reasonable efforts to seek remedies for infringement, and (3) [NPI]'s failure to comply with Keesmann's audit requests.

No reference to the termination process was provided, nor was there any indication of the opportunity for sixty days to cure.

NPI stated it was surprised about the suddenness of the termination, but nonetheless, offered to cure the alleged defaults with a proposed sublicense for the patents. Keesmann's final response, on April 28, 2006, made clear his desire to terminate the License Agreement immediately. He informed NPI that discussions about the audit and sublicense should cease. Keesmann refused to honor the sixty day cure period.

At the time the License Agreement was drafted, Keesmann was free to negotiate its terms to his satisfaction. The agreement provides for certain performance hurdles and provisions that were agreed upon by both parties. Moreover, the agreement provided relief if a party defaulted or if the License Agreement was dissolved. It appears that NPI has complied with the terms of the agreement and for the foregoing reasons, this Court believes that NPI has demonstrated that it has a reasonable, and better than negligible, chance of prevailing on the merits. Thus, the first prong of the preliminary injunction analysis is satisfied.

*B. Irreparable Harm and Inadequate Remedy at Law*

Having met the first element of a preliminary injunction claim, NPI must now show that

it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if the injunction is not issued. *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386 (7th Cir. 1984). Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered. *Id.*

NPI argues that if a preliminary injunction is not issued, Keesmann will likely sell the patents to bona fide purchasers before the lawsuit is settled. Those purchasers would likely be foreign and, thus, be outside of this court's jurisdiction. NPI also claims that there is no adequate remedy at law because the value of the patents has not been tested in the undeveloped carbon nanotube cathode market. Finally, NPI claims that because patent rights are unique personal property, money would not adequately compensate for their loss. The preliminary injunction, NPI states, protects its unique patent rights and protects pending joint ventures seeking commercial applications for the patents. A preliminary injunction safeguards NPI's current and future customers, including its sales, profits and business goodwill. Keesmann argues that there is, in fact, a value for the patents, namely the $200,000,000 price tag that NPI placed on the patent rights in December, 2005 when Keesmann first expressed his desire to sell the patents.

We conclude that the sale of the patents, before the end of litigation, would constitute irreparable harm to NPI because their rights under the License Agreement would be irretrievably damaged. Moreover, because of the nature of the unique patents and their undeveloped market, evaluating the amount of damages due to NPI is speculative, leaving equity as a more just remedy than money damages. Therefore, the Court believes that NPI has also met its burden to demonstrate irreparable harm and an inadequate remedy at law.

*C. Balance of Hardships*

In balancing the harms, the Court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose. *Roland*, 749 F.2d at 387-88. Having concluded there is an irreparable harm to NPI if the preliminary injunction is not issued, the Court must now assess the harm Keesmann may suffer under the preliminary injunction.

Keesmann argues that he will suffer because his patents have "languished" over the past six years, and that half of the lives of the patents have almost passed. Although both sides agree that a successful sublicense could generate hundreds of millions of dollars, NPI argues that it has shouldered the majority of risk of an undeveloped market. Further, in oral arguments, Keesmann did little to disprove NPI's reasoning that there has been no sublicense because there is not yet a market in carbon nanotube cathodes. Finally, the error of denying a preliminary injunction to NPI could place it in a position in which the patent rights revert back to Keesmann, while the error of granting the preliminary injunction would merely delay Keesmann's ability to claim his patents during the pendency of this lawsuit. In light of the above, the Court believes the balance of harms weights in NPI's favor.

*D. The Public Interest*

The last element in a preliminary injunction analysis is whether, if granting the preliminary injunction will have consequences beyond the immediate parties, the public interest should be considered. *Roland*, 749 F.2d at 388. Because this is essentially a private contract dispute, the Court is not inclined to weigh the public interest here. The parties agree that

13

Keesmann's patents are potentially some of the preeminent patents in the nanotechnology field. Keesmann argues that the public interest is not served by the patents being frozen in litigation. However, the consequences of this dispute, beyond NPI and Keesmann, are purely speculative. The public interest we do consider is the sanctity of contracts and ownership. Because the denial of the preliminary injunction could result in the premature or invalid termination of the contract, we conclude this last element also weighs in NPI's favor.

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice And Procedure § 2948, pp. 129-30 (2d ed.1995)). We believe that NPI has carried that burden successfully here, and thus, Plaintiff's motion for preliminary injunction is granted.

## BOND

Rule 65(c) of the Federal Rules of Civil Procedure provides that:

> [n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him. *Ty, Inc. v. Publications Intern. Ltd.*, 292 F.3d 512 (7th Cir. 2002). The amount of a security bond is in the discretion of the Court. *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972).

14

The parties are invited to suggest what bond would be appropriate. The Court shall hold a hearing to discuss this on February 8, 2007, at 2:00 p.m.

This injunction will not issue until the Court determines the correct bond.

## CONCLUSION

Keesmann, his agents, employees, and all those acting in concert with him, will be enjoined from terminating the License Agreement or otherwise acting in violation of the License Agreement, subject to bond determination as indicated above.

For all of the reasons stated above, Plaintiff's motion for a preliminary injunction [7] will be granted, subject to bond determination. Plaintiff's other pending motions [15] and [35] for hearings were granted.

It is so ordered.

Wayne R. Andersen
District Court Judge

Date: January 30, 2007